*308 OPINION OF THE COURT
Edward J. Greenfield, J.
Plaintiffs, wholesale drug dealers and a professional pharmaceutical society, sue to enjoin the State Department of Social Services, the RX Data Corp. and municipal agencies of the City of New York from carrying out a certain contract executed April 4, 1977 between the Department of Social Services and the RX Data Corp. It is the contention of the plaintiffs that the agreement is patently illegal and that as a result thereof, it confers substantial financial benefits on a private business to their detriment and the detriment of the public at large.
What is involved in this case is the system employed by the State, and previously by the city, under which information is supplied which forms the basis for payments for Medicaid prescriptions which are filled by the retail pharmacies who are members of the plaintiff society.
The Medicaid payments to pharmacies are made pursuant to a formula set up by the United States Department of Health, Education and Welfare. Prior to August 19, 1976, the payment formula was based upon the average wholesale cost of the particular drug dispensed by the pharmacist. Thereafter, new regulations were promulgated providing for a system of reimbursement to the pharmacies based upon either the usual and customary price charged to the general public or the departmentally computed estimated acquisition costs (EAC) of such drugs. Section 365-a (subd 2, par [f]) of the Social Services Law was amended to direct compliance with the new Federal regulations. The legislation was effective in all of New York State outside of New York City on July 1, 1977, and became effective in New York City on April 1, 1978.
Under the previous practice, plaintiff S-P Drug Co., Inc., Rogers Wholesalers, Inc. and Ketchum & Co., Inc., as wholesale drug distributors competing with one another, attempted to provide the retail pharmacies with price information as to the average wholesale cost of drugs so that they could calculate what their likely Medicaid reimbursement would be. The list of drugs being long and bulky, they developed the practice of putting all the price data on microfilm or upon microfiche cards which can be used by utilizing an appropriate machine or reader. This information, as to the average wholesale drug costs, together with other helpful information as to the drugs, was provided to the retail pharmacies by the plaintiff drug *309 distributors for a fee. Defendant RX Data Corp. is evidently also in the business of providing such service to pharmacists, and all the companies compete freely in servicing the drug stores and providing them with the requisite information.
The information as to the allowable reimbursement costs which the plaintiffs and others provide to the retail pharmacies was supplied on a current basis by the Human Resources Administration of the City of New York, which, prior to April 1, 1978 was responsible for the reimbursement of pharmacies in conjunction with the Department of Health, Education and Welfare. If any independent retail pharmacist elected not to subscribe to any of the available microfiche services, the price information was available free of charge from the Human Resources Administration.
When the law changed on April 12, 1977, section 365-a (subd 2, par [f]) of the Social Services Law required the State Department of Social Services to establish its own maximum reimbursement amounts for the filling of Medicaid prescriptions in accordance with standards set by the Department of Health, Education and Welfare. This would have required the Department of Social Services to compute the reimbursement prices for Medicaid prescriptions on the basis of estimated acquisition costs. In order to carry out this program, the Department of Social Services entered into the contract with RX Data Corp. which is the subject of attack in this lawsuit. The contract was executed without any public announcement or bidding. Under that contract, the RX Data Corp. was to supply to the State the estimated acquisition cost prices and formulary. These were to be supplied on a monthly basis for at least 3,500 of the most frequently purchased drug products. The Department of Social Services agreed not to disclose the underlying documentation for the estimated acquisition costs of drug products. All reports furnished to the department were to become its property, but the State granted to RX Data Corp. the right to obtain statutory copyright for the price lists. Copies were to be supplied at specified costs for social services districts in the State of New York and the price list (which ran in excess of 1,00 pages) would be available for purchase by any member of the public at the price of 25 cents per page. The State agreed to pay RX Data Corp. the sum of $975 for the information which was to be supplied.
Armed with this exclusive access to price lists and the sole right to distribution to the public with the right conferred *310 upon RX Data to copyright the information so as to assure its exclusivity, RX Data Corp. proceeded to market the lists on microfiche to retail pharmacies, including former customers of the plaintiff drug distributors at a price of $20 per month. These lists are marketed to the druggists as the sole official New York State figures. Plaintiffs estimate that this granting of the exclusive right to RX Data Corp. will produce in excess of one million dollars in sales to the RX Data Corp., almost all of which would be profit.
It is the contention of the plaintiffs that the contract grants to a private business a virtual monopoly on information essential to the operation of retail pharmacists; that it is in derogation of the Freedom of Information Law (Public Officers Law, §§ 85-90); that it illegally grants copyright privileges to the contractor on information which should be in the public domain; and that the agreement to reimburse the RX Data Corp. the sum of $975 is a patent attempt to avoid the requirements of public bidding, generating a windfall to that company, thus constituting an illegal giveaway of public property.
While the amendment of section 365-a (subd 2, par [f]) of the Social Services Law provides that nothing contained therein should be construed to alter, change, affect, impair or defeat rights acquired prior to enactment (L 1977, ch 77, § 29), plaintiffs contend that they have now been denied their former right to free information and their right to compete on an equal footing with others similarly situated. RX Data Corp., in its promotion announcements to pharmacists, notified the trade that the maximum allowable New York State reimbursement lists were its exclusive property and could be distributed and purchased only from RX Data Corp. at a price of $240 per year. RX Data Corp. has also offered to make its lists available to the drug wholesalers, who are plaintiffs in this case, at a cost of $10 per month per customer — in effect licensing them at a price to distribute information that was previously free.
The very recital of the facts pertaining to this contract demonstrates the numerous vices that inhere therein. The lists upon which the formula for Medicaid reimbursement for prescriptions is based is a compilation or tabulation upon which a State agency predicates its decisions. Sections 85 through 90 of the Public Officers Law require that such information which goes into the decision making process must *311 be accessible to the public and subject to its inspection. The State cannot evade the obligations of the law by agreeing not to disclose the drug price data and documentation, requiring any interested member of the public to purchase that information from a private party at a price. While the State is entitled to reimbursement for the cost of reproducing the list for anyone who wishes it, contracting out this right to permit a private company to make a profit by purveying the information must be regarded as a perversion of the Freedom of Information Law. The Legislature declared its intent with respect to freedom of information when it declared:
"The people’s right to know the process of government decision-making and the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality.
"The legislature therefore declares that government is the public’s business and that the public, individually and collectively and represented by a free news media, should have unimpaired access to the records of government”. (Public Officers Law, § 85, L 1974, ch 578, § 2; presently § 84, L 1977, ch 933, § 1, emphasis added.)
It is difficult to see how the public is to have "unimpaired access” if every pharmacist who wishes to know the reimbursable price to be allowed by the State is to be compelled to purchase his information exclusively through one private company. While the State is empowered to charge up to 25 cents a page for reproduction (presumably the cost of photocopying each individual page) so that a complete list of over 1,000 pages would cost the purchaser over $250 per month, individuals or companies like the plaintiffs could freely reproduce the master list and make it readily available to those who wish to have the information at a lower price, or no price at all, but for the grant by the State to one company alone of the exclusive and proprietary right to what clearly should be public information.
It is this very same grant of exclusivity which vitiates the contract on other grounds. Section 340 of the General Business Law declares as a matter of public policy of this State that every contract, agreement or an arrangement establishing a monopoly in the conduct of any business or in the furnishing of any service in this State, and restraining the free exercise of competition is illegal and void. It is anomalous *312 indeed to have the State itself creating such a monopoly and restricting effective competition in a private business. This statute outlawing monopoly has been on our books since 1899 and very few activities in business, trade or commerce are excluded therefrom, except for those for such businesses the very nature of which would effectively preclude competition, such as public utilities (Matter of Attorney-General v Inter-borough-Metropolitan Co., 125 App Div 804; Matter of Jackson, 57 Misc 1); television rights (Matter of Sullivan County Harness Racing Assn. v Glasser, 68 Misc 2d 579, affd 38 AD2d 690, revd other grounds 30 NY2d 269); professional sports teams (American League Baseball Club of N. Y. v Pasquel, 187 Misc 230); or bar associations (Matter of Freeman, 40 AD2d 397, affd 34 NY2d 1). Indeed, a violation of this statute is deemed to be a class E felony (General Business Law, § 341).
Defendant RX Data Corp. has urged this court to consider the present motion as academic because the agreement was never acted upon by either of the parties and was abandoned. Such a claim is specious, and is a manifestation of bad faith. The State readily concedes that RX Data Corp. has been regularly furnishing it with the price lists and information as called for under the contract, and plaintiffs have demonstrated that RX Data Corp. has continued to promote and market its price lists to retail pharmacies. The alleged "abandonment” consists merely of RX Data Corp. having waived its claim for the $975 payment from the State, as well it could, since it is in a position to reap profits of up to one million dollars from the retailers who have been directed to it by the State.
While it is all well and good for the State to compensate the contractor for the furnishing of service, provided that it is done in accordance with the law, this court cannot understand how the State can grant to a private contractor the right to copyright information which is, and should be, in the public domain. Granting such an exclusive right to a private business and permitting it to profit from the right the State confers upon it to use public information is indeed a bargaining away of public property without proper consideration.
 If it is claimed that the consideration for the granting of such a right consists in part of a greatly lowered price that the private contractor charges the State for compiling and supplying the information, the illegality of the contract is further demonstrated. Section 174 of the State Finance Law *313 requires competitive bidding except when a State department or agency may purchase specified equipment or supplies up to $1,000. The pegging of the price of the contract herein involved at $975 was a transparent attempt to come under the exception for public bidding by purportedly fixing the consideration at $25 less than the cutoff price. In actual fact, however, as has been indicated, the contract had an actual value of up to one million dollars. The alleged abandonment by RX Data Corp. of the $975 payment shows how inconsequential it is in the light of the over-all contractual scheme.
It is contended that since the State would be entitled to receive 25 cents per page from those who wished to have copies of the price lists, it is perfectly permissible for it to permit an outside company to do the actual work of reproducing the pages and charge a fee which is less than that permitted by statute. The vice in this thinking is that if the State wished to contract out its photocopying or printing work, it would have to invite competitive bidding and award the printing or photocopying contract to the lowest bidder. It cannot evade that requirement by the simple device of permitting another company to have the exclusive right to reproduce its documents for the same fee. RX Data Corp. by this contract is made the State printer of the lists, but the State leaves it to private parties to pay its printer. The contract in question attempts to ignore the middle man, but whether explicitly mentioned or not, his presence remains.
The claim that the contract called for unique and specialized service, and therefore could properly be negotiated rather than being open to competitive bidding is without foundation. No unique or specialized services are involved. Any data processing company could put together monthly price lists of thousands of items, and no unique skills or expertise are required to do the underlying investigation as to those prices. The very fact that there were numerous companies in the field providing precisely those services as to which defendant RX Data Corp. has now been granted a monopoly belies the contention. Any one of them could have carried out a similar function, and cannot validly be denied the right to compete in providing the necessary services.
In view of the multifaceted illegality presented by this contract, the argument that it should be permitted to continue because there is no showing of irreparable injury, could not withstand analysis. A contract which appears to be illegal on *314 its face, and which flies in the face of legislative policy and the public interest cannot readily be justified. The damage to the public is apparent, as is the irreparable harm to the large group of pharmacists who will be required to subscribe to RX Data Corp.’s services in order to operate meaningfully under the State Medicaid program. Similarly, the damage to the potential competitiors cannot readily be measured in terms of money damages, since it would be impossible to calculate which subscribers they lost and the total impact on their business as a result of their being shut out of the competition. They need not be compelled to perform as mere licensees of RX Data Corp. in order to survive.
The argument raised most strenuously against enjoining the carrying out of the contract is the defense of "chaos”. The contention is that striking down the contract would make it impossible for the State Department of Social Services to function in reimbursing pharmacists for Medicaid prescriptions. While such a defense cannot justify the continuance of an invalid agreement, this court is not convinced that chaos will ensue and that the Medicaid program just transferred to State administration will be seriously hampered. Interim arrangements can surely be worked out between the parties to supply the State Department of Social Services with the information necessary for them to determine the appropriate amounts of reimbursement. The court will accept alternative suggestions in the order to be settled herein.
The motion for a temporary injunction is granted and the defendants are enjoined from implementing the terms and conditions of the contract of April 4, 1977. Defendant RX Data Corp. is enjoined from soliciting or executing any contracts with pharmacists upon any representation that it has the sole right to distribute and disseminate information as to drug prices and Medicaid formulae for reimbursement. The parties may move for an early trial on the issues raised in the pleadings when issue is joined, or they may move for summary judgment if there are no factual issues to be tried.