**NIAGARA FRONTIER TARIFF BUREAU, INC., Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 931, Docket 86–4174.

United States Court of Appeals, Second Circuit.

Argued March 17, 1987.

Decided Aug. 20, 1987.

Patrick McEligot, Washington, D.C. (Bryce Rea, Jr., Rea, Cross & Auchincloss, Washington, D.C., of counsel), for petitioner.

Laurence H. Schecker, Washington, D.C. (Robert S. Burk, General Counsel, Ellen D. Hanson, I.C.C., Washington, D.C., Charles F. Rule, Acting Asst. Atty. Gen., Robert B. Nicholson, John P. Fonte, Dept. of Justice, Washington, D.C., of counsel), for respondents.

Before KEARSE, MINER and MAHONEY, Circuit Judges.

MINER, Circuit Judge:

Petitioner Niagara Frontier Tariff Bureau, Inc. ("NFTB" or "Bureau") petitions for review of an order of the Interstate Commerce Commission ("ICC" or "Commission") rejecting a proposed tariff supplement. Approved by a collective vote of NFTB members, and included as part of a larger NFTB tariff to increase commodity rates, class rates, and minimum charges, the rejected tariff supplement provided for increases in terminal service charges.

Objections to NFTB's terminal service proposal were filed with the ICC. The Commission initiated an investigation to determine whether the tariff proposal violated the statutory prohibition against collective consideration of single-line rates. *See* 49 U.S.C. § 10706(b)(3)(D) (1982). NFTB contended that its tariff proposal was permissible under its interpretation of the statute. The ICC, however, adhered to its prior rejection of petitioner's construction of the statute. *See Niagara Frontier Tariff Bureau, Inc.*, 1 I.C.C.2d 317 (1984), *aff'd per curiam*, 780 F.2d 109 (D.C.Cir.1986). Petitioner also argued before the ICC that the proposed tariff schedule fell within one or more of the statutory exemptions to the section 10706(b)(3)(D) prohibition. The ICC determined that none of the exemptions was applicable and rejected the proposed tariff supplement in an order dated August 1, 1986.

Because we conclude that petitioner is collaterally estopped from reasserting its statutory construction, and that the ICC's rejection of the proposed tariff supplement was based on a reasonable construction of the statute, we deny NFTB's petition for review.

## I. BACKGROUND

Petitioner NFTB is one of a number of rate bureaus whose membership is composed of motor common carriers, primarily trucking firms. NFTB serves as a forum for setting, through collective agreement of its membership, the tariffs charged by its members for the transportation of general commodities. Under an agreement approved by the ICC pursuant to 49 U.S.C. § 10706(b) (1982), NFTB operates with immunity from federal antitrust laws and submits its proposed tariffs to the ICC for approval.

On November 21, 1985, NFTB filed with the Commission a proposed tariff increase, scheduled to take effect on January 6, 1986. The tariff had been approved by a collective vote of NFTB members and was designed, *inter alia*, to adjust commodity rates, class rates, minimum transportation charges, and terminal service charges. Terminal service charges subject to the proposed increases included charges for pickup and delivery, cargo weight verification, marking and tagging of freight, and transfer of lading from one vehicle to another. The proposed tariff would raise charges at individual terminals to match those rates charged by other bureaus; as a result, the individual increases at specific terminals varied widely.

Two organizations of shippers protested the terminal service adjustments and filed petitions with the ICC, contending that, because the tariff included single-line terminal charges, the collective fixing of the rates to be charged by each individual carrier constituted illegal anticompetitive ratemaking. *See* 49 U.S.C. § 10706(b)(3)(D). As defined by the ICC in prior rulings, a single-line rate is a rate charged by a single carrier completely performing the service to which the charge applies, even though other carriers may be able to provide that service.

As a result of the protests, the ICC initiated an investigation of NFTB's proposed tariff. NFTB attempted to justify the tariff by contending that the ICC's interpretation of the statutory bar to collective action on single-line ratemaking was overly broad. NFTB argued that, properly construed, the statute is inapplicable where more than one carrier offers the service in question. Alternatively, NFTB claimed that its formulation of the rates was permitted by one or more of the statutory exemptions to the prohibition against collective establishment

of single-line rates. *See* 49 U.S.C. § 10706(b)(3)(D)(i), (iii), (iv).

The Commission found neither argument persuasive. Relying on its definition of single-line rates and on its previous rejection of NFTB's argument, *see Niagara Frontier Tariff Bureau, Inc.*, 1 I.C.C.2d 317 (1984), *aff'd per curiam*, 780 F.2d 109 (D.C.Cir.1986), the Commission concluded that the proposed tariff was barred by section 10706(b)(3)(D). The Commission also rejected NFTB's attempts to invoke the statutory exemptions.

As a result, the Commission rejected the proposed terminal service tariff by an order dated August 1, 1986. The instant petition for review followed.

## II. DISCUSSION

### A. Collateral Estoppel

Petitioner challenges the Commission's interpretation of the term "single-line rates" as it has been applied in the context of the statutory bar to collective ratemaking. Through the passage of the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980) (the "Act"), Congress sought to increase competition within various segments of the motor carrier industry. One means employed was to prohibit collective decisions to establish "single-line rates," 49 U.S.C. § 10706(b)(3)(D), which are defined as "a rate, charge, or allowance proposed by a single motor common carrier that is applicable only over its line and for which the transportation can be provided by that carrier," *id.* § 10706(b)(1). The ICC consistently has interpreted the prohibition to encompass any collective action on rates for services that are performed entirely by a single carrier, irrespective of whether more than one carrier actually is able to provide those specific services.

Petitioner argues that, properly interpreted, the single-line prohibition is not applicable when more than one carrier is involved in the proposed rate. Under the construction proffered by NFTB, the prohibition applies only to independent rates set by a single carrier so that, even though a single carrier performs the service and col-

lects the charge, the statutory bar does not apply if more than one carrier is capable of providing that service.

The Commission, however, rejected petitioner's argument in a previous challenge to the ICC's interpretation of the single-line prohibition. In that prior proceeding, the ICC ruled:

The correct analysis . . . focuses on whether a rate proposal is for . . . a single carrier's line where that carrier can perform the service from origin to destination. If the proposed rate would apply to another carrier's single-line operation, or would apply for both a single-line and joint-line service, it is a single-line rate on which collective activity is barred.

*Niagara Frontier Tariff Bureau, Inc.*, 1 I.C.C.2d 317, 320 (1984), *aff'd per curiam*, 780 F.2d 109 (D.C.Cir.1986). NFTB then petitioned for review of this ruling, renewing its challenge to the Commission's construction of the statute. Petitioner's proffered reading of the statute was rejected as "border[ing] on the frivolous" and the ICC's construction was upheld. *Niagara Frontier Tariff Bureau, Inc. v. United States*, 780 F.2d 109, 110 (D.C.Cir.1986) (per curiam). The court also noted that the definition advanced by petitioner "would make the prohibition on single-line rates wholly redundant of the provisions of the Act [49 U.S.C. § 10706(b)(3)(B)(ii) ] that already allow for 'independent action' by a single carrier." *Id.* (citation omitted).

Petitioner now raises the same argument in the instant petition for review. We hold that petitioner is collaterally estopped from relitigating its challenge to the Commission's interpretation of the statute. "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)). Collateral estoppel, or issue preclusion, properly is applied to bar relitigation of

claims when: (1) the issues presented "are in substance the same as those resolved" in the prior litigation; (2) no "controlling facts or legal principles have changed significantly" since the prior proceeding; and (3) no special circumstances warrant an exception to the normal rules of preclusion. *Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974–75, 59 L.Ed.2d 210 (1979).

■ Although the prior proceeding involved commodity rates rather than terminal service charges, the same issue raised by NFTB in the instant petition, i.e., the proper meaning of single-line rates, was resolved adversely to petitioner by the ICC and the Court of Appeals for the District of Columbia Circuit. In addition, we note that although the Supreme Court has abandoned the former requirement of mutuality of parties as an element of collateral estoppel, *see Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the fact that the same parties who litigated the prior action are now before us presents a particularly compelling case for application of the doctrine.

We are presented here with identical issues and identical parties, and petitioner alleges neither changes in controlling facts or law, nor any special circumstances to warrant an exception to the principles of collateral estoppel. We conclude that relitigation of petitioner's statutory construction argument properly is barred because resolution of this issue was " 'necessary and essential to the judgment in [the earlier] action.' " *Wickham Contracting Co. v. Board of Education,* 715 F.2d 21, 28 (2d Cir.1983) (quoting *RX Data Corp. v. Department of Social Services,* 684 F.2d 192, 197 (2d Cir.1982)); *see* Restatement (Second) of Judgments § 27 (1982). We will permit neither "a rerun review ... with no real change in the cast of characters, the facts, or the legal arguments," *Western Coal Traffic League v. ICC,* 735 F.2d 1408, 1411 (D.C.Cir.1984), nor "a second opinion ... from another circuit," *id.* at 1412, as petitioner here attempts to obtain.

**B.** *Statutory Exemptions*

Petitioner also maintains that the proposed tariff falls within one or more of the statutory exemptions to the collective rate-making prohibition. The ICC, however, concluded that the exemptions for general rate increases, 49 U.S.C. § 10706(b)(3)(D)(i), changes in tariff structures, *id.* § 10706(b)-(3)(D)(iii), and changes in rules or regulations, *id.* § 10706(b)(3)(D)(iv), were inapplicable to NFTB's proposal. While we address each of petitioner's statutory exemption arguments individually *infra*, we initially note two general principles that guide our analysis.

■ First, because they are strongly disfavored, exemptions from federal antitrust laws are to be strictly construed. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* — U.S. ——, 106 S.Ct. 1922, 90 L.Ed.2d 413, 415 (1986); *Abbott Laboratories v. Portland Retail Druggists Ass'n,* 425 U.S. 1, 11–12, 96 S.Ct. 1305, 1313–14, 47 L.Ed.2d 537 (1976). This rule of construction applies not only to implied exemptions, but also to express statutory exemptions. *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 126, 102 S.Ct. 3002, 3007, 73 L.Ed.2d 647 (1982); *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979).

■ Second, we are constrained to accord considerable deference to the interpretation of a statute advanced by the executive department entrusted to administer it, *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), and its construction "should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Even where a statute is ambiguous, reviewing courts will not overturn

the agency's interpretation, provided that it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782 (footnote omitted). To be upheld by a reviewing court, the agency's interpretation merely need be sufficiently rational, *Chemical Mfrs.*, 470 U.S. at 125, 105 S.Ct. at 1107–08, or reasonable, *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479–80, 43 L.Ed.2d 731 (1975).

### 1. General Rate Increases

■ The first of the statutory exemptions seized upon by petitioner permits collective action to establish general rate increases, provided that such increases are limited to industry average costs and that no discussion of individual markets or particular single-line rates is involved. 49 U.S.C. § 10706(b)(3)(D)(i). "General rate increase" has been defined by the Commission as "a proposed general adjustment of substantially all the rates published in a rate bureau's tariff or tariffs." 49 C.F.R. § 1331.5(j)(1) (1986). This definition is wholly consistent with the legislative history of the Act. *See* H.Rep. No. 1069, 96th Cong., 2d Sess. 28 (general rate increases are those increases "that are applicable to all rates charged by one or more carriers"), *reprinted in* 1980 U.S.Code Cong. & Admin.News 2283, 2310; *cf. American Trucking Ass'n v. United States*, 688 F.2d 1337, 1349 (11th Cir.1982) (reviewing legislative history), *rev'd on other grounds*, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984).

The Commission properly concluded that petitioner's terminal service proposal does not fall within this exemption. While NFTB's tariff proposal for other services increased rates generally by six percent, its proposed increases in terminal service rates varied widely among individual terminals, thus enabling NFTB to match the rates charged by other bureaus. *See* Joint App. at 192–94. We think it clear, therefore, that substantial evidence supported the conclusion that the proposal involved a "discussion of individual markets" and was not limited to average industry costs as required to come within the exemption. In addition, it is apparent from the record that the terminal rates portion of the proposal was considered and approved by NFTB members separately from the general increase proposed for other rates, Joint App. at 153–55, lending support to the ICC's conclusion that the terminal service tariff was not part of a general rate increase. Moreover, the ICC repeatedly has ruled that a proposal is not a general increase when it increases only one segment of the transportation charge. *E.g., Pickup and Delivery at Private Residences*, ICC Docket No. M–30376 (slip op. May 2, 1986); *Collectively Set Delivery Charges at Eastern Kentucky*, ICC Docket No. M–30374 (slip op. Mar. 19, 1986). In sum, we see nothing unreasonable in the Commission's construction of the exemption for general rate increases, and we agree that the exemption is not of proper application to petitioner's terminal service rate proposal.

### 2. Tariff Restructuring

■ Petitioner also attempts to avail itself of the exemption for collective action on changes in tariff structures. 49 U.S.C. § 10706(b)(3)(D)(iii). However, this exemption is restricted to industry average costs, and it specifically excludes collective discussion of individual markets. *Id.* The ICC has interpreted this exemption to encompass only a broad restructuring of the manner in which rate bureaus organize or calculate tariffs and to exclude the aggregation of many individual and specific rate adjustments. *See Motor Carrier Rate Bureaus—Implementation of PL 96–296*, 364 I.C.C. 464, 493–94 (1980), *aff'd in pertinent part sub nom. American Trucking Ass'n v. United States*, 688 F.2d 1337 (11th Cir. 1982), *rev'd on other grounds*, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984); *see also Collectively Set Accessorial Rates and Charges on Household Goods*, ICC Docket No. M–30371 (slip op. Nov. 22, 1985).

Again, we find nothing unreasonable in the Commission's interpretation; its conclusion that collective discussion of the rates in a particular locality is an impermissible discussion of individual markets is amply supported by the legislative history of the

Act. *See* H.Rep. No. 1069, 96th Cong., 2d Sess. 28 (single-line rates, when not based on "industry average costs," are to be determined by individual carriers based on their "own cost structures"), *reprinted in* 1980 U.S.Code Cong. & Admin.News 2283, 2310. As we previously have discussed, there is substantial evidence in the record to support the ICC's determination that, in raising terminal rates to match those charged by other bureaus, petitioner violated the express provisions of the statute by considering individual markets.

### 3. *Rule Changes*

■ Petitioner's claim that the proposed tariff falls within the exemption for "changes in rules or regulations," 49 U.S.C. § 10706(b)(3)(D)(iv), merits little discussion. The exemption speaks of changes in a rate bureau's rules, not changes in rates. Petitioner's terminal service tariff proposed specific rate increases rather than "changes in rules or regulations which are of at least substantially general application." *Id.* Resort to legislative history is unnecessary; a plain reading of the statutory exemption leaves no doubt as to its inapplicability to petitioner's rate proposal. The Commission's interpretation, therefore, hardly can be termed anything other than reasonable.

### CONCLUSION

Based on the foregoing, we conclude that petitioner is collaterally estopped from challenging the Commission's interpretation of the single-line prohibition, and that the Commission's disposition of petitioner's statutory exemption claims was based on a reasonable construction of the statute. We therefore deny the petition for review.